at AL. And Mr. Gold, if you would prefer to speak from council table, that's satisfactory. Thank you very much, Your Honor. I certainly appreciate it. I want to thank the court for the accommodation in the court's office, too. No problem. Good morning, Your Honors. My name is Fred Magaziner from the law firm of Deckard, LLP. I represent the appellant, Robert Spruill. I would like to reserve three minutes for rebuttal. That's great. May it please the court, Mr. Spruill's complaint alleges that he had a serious medical need and that the defendants, Dr. McLaughlin and Mr. Brown, were deliberately inattentive to it. The district court, in its first dealing with this case, granted the defendant's motion to dismiss on the ground that Mr. Spruill had not adequately alleged the elements of a deliberate indifference claim. Mr. Magaziner, let me interrupt you because I think we're well familiar with the facts and I'm concerned with a bottom line issue that I want to address for you and for your opposing counsel, too. You make a statement in your reply briefing on page 6, following. Spruill was forced to litigate the case, A, on his own, B, from prison, C, without being able to take depositions, D, without being able to defend his own deposition, and E, without being able to retain an expert. And I think you put that front and center to emphasize, you know, it's unfair. He shouldn't have been put in this posture. And my question to you is, how does that make Mr. Spruill different from any other of thousands of incarcerated persons in America who are upset with some aspect of their treatment, including medical treatment, frequently? How does that make him different from the rest of the population who wants to sue? Well, I appreciate the question, and let me respond in two ways. First, I'm not here trying to ask the Court to pronounce a new policy that will be broadly applicable. I think it's very important to look at the particular facts of this case. But the point of my question, Mr. Magaziner, is how could we pronounce the judgment you want without affecting a lot, a lot, a lot of other people? In other words, I don't think you'd be contending that all prisoners should have counsel. By no means. And the law creates a number of hurdles for which each prisoner has to, or over which each prisoner has to jump in order to get to this position. First of all, under CABRON, the first fundamental inquiry is whether the claim has arguable merit in fact and in law. That was answered in the affirmative both by the District Court and by the Court of Appeals in the first go-round. Was it really? I mean, that was at the 12B6 stage. I'm not so sure. You have to show that there's more than an extremely thin chance of success on the merits here. This is pretty thin. Well, I mean, with respect to Judge Ambrose, in the Court of Appeals decision that was offered by Judge Becker and joined by Judges Alito and Chertoff, the Court of Appeals said that there was certainly a lot of evidence that the medical need was serious, that it needed to be fleshed out on remand. And the Court said, reviewed Mr. Spruill's allegations about the state of mind of the defendants, and again said he has adequately alleged a culpable... Alleged? That's the point. I think that's the question you're getting from Judge Ambrose and from... We're now at summary judgment. Yeah. Well, in summary judgment, if I may make this point, let me, may I just finish the other one? Sure. Which is under the Prison Litigation Reform Act there are a number of hurdles that you have to jump over and if Mr. Spruill is entitled to counsel in this case, that does not mean that thousands and thousands of prisoners will automatically be entitled to counsel. There are filters created by the statute which, when applied, will get rid of most of those thousands of cases. There are not that many cases that come into court in this posture. But to the question about summary judgment, one of the challenges for Mr. Spruill on remand was to develop evidence about the state of mind of the defendants. Mr. Spruill said the defendants deliberately withheld from me the medical care that I required, and they did so because of their animus toward me. Let me stop you right there. What is it that he is contending they should have done that they didn't do? We have over a dozen instances of their medicating him with some pretty heavy-duty drugs that are not narcotics. He seems to believe they should have been giving him narcotics. What else is it that he contends they did or failed to do from a medical standpoint that would cause us to say, Aha, there is deliberate indifference. There is something here that goes beyond the pale of what is permissible. In the record as it now stands, Judge Rendell, Mr. Spruill's deposition testimony says that he repeatedly asked to be admitted to the infirmary, and they repeatedly said to him in response, there's no way in the world that you are ever going into any infirmary. You can bet on that. That's in the deposition. I can cite you the pages if you'd like. I'll do that. I'll make a note of that. All right. What would the infirmary have done? What is it that he needed in an infirmary? I mean, I can hear that going back and forth, you know, that will never happen. Okay. But maybe it will never happen because he doesn't need to be in the infirmary. The evidence is in the previous prison he was put in the infirmary a number of times for treatment. Do I know what that was? Of course I don't know, Your Honor. I'm sorry I don't know. I can only work with the record I have. I realize that. But we need to deal with the record we have too. Yes, but what I would say is if you look at the Tavron factors, which this Court said are the factors that this Court is supposed to write. You may do well in the Tavron factors, but the gatekeeping function is do you have arguable merit? And at this point, now that we're at the summary judgment stage and now that we've fleshed out more in the record what actually occurred, what support do you have that you can survive anywhere an Eighth Amendment challenge based on deliberate indifference? Your Honor, my answer would be this. The district court created two catch-22s for Mr. Spruill. First, the district court said in order for you to survive summary judgment, you probably need expert testimony. The district court said it was significant that you do not have any expert testimony showing that the treatment you received was so inadequate, given the nature of your injuries, that one could infer from that treatment a deliberate indifference. So Mr. Spruill has put in a catch-22. He's told you need expert testimony about the treatment you received. He said he was going to use Dr. Stanley at trial, didn't he? He had access to some surgeons that he could have brought forth, didn't he? You're saying that Mr. Spruill said he was going to use Dr. Stanley? Yes. If that's in the record, I don't remember that, Your Honor. At least it's suggested by the district court that there is a neurosurgeon that you might go to. That's correct, Your Honor. Now, but you are discussing – well, let me take a step back. You're certainly correct that there's record evidence that Mr. Spruill was trying hard to get stuff that he thought he ought to have for his case. That does seem pretty clear in the record. But assume for the sake of discussion that he had been able to get an expert to come in and say the things that seem within the realm of the rational, within this case, the case where you have Dr. Osgood on record saying, in effect, conservative treatment, not surgery at this point, medication is sufficient. That's the doctor from the last correctional institution, which he seemed to like better, Mr. Spruill liked better. And then you have this doctor taking the same attack. But if you've got an expert in there, even if it turned out that those doctors were wrong, is it reasonable to suppose that you would have had a doctor come in and say, well, those people are nuts, that this is so bad that anybody looking at this would have had to have been a mangala to let this go forward? I mean, because isn't it that kind of dramatic testimony that Mr. Spruill would have needed to make the point that what he was being told by Dr. McLaughlin was so far beyond the pale it could be viewed as cruel and unusual? No, I don't think so, Your Honor, with all due respect. I think that, to back up a moment, Mr. Spruill had had surgery sometime before 1998. I don't know when, but that's in the record. He again had surgery in 2004. In 2001, when Dr. Osgood examined him, Dr. Osgood said, at this point, Mr. Spruill does not seem to be in pain. But if the pain becomes worse, and it's right in Dr. Osgood's report, then other things will need to be considered. That was in February. This is several months later. I don't know from the record, one way or the other, whether Dr. Osgood would say, if proposed, that he would be surprised to see that Mr. Spruill's pain had gotten much worse. This is a chronic condition. It had already required a laminectomy. It had required narcotic painkillers. They had been prescribed at the previous correctional institution. But wasn't the diagnosis here spinal stenosis? Yes, sir. And what is the normal treatment at this point? After the laminectomy, apparently it was not completely successful. He'd had an earlier laminectomy. He had a later surgery in 2004. He had been prescribed narcotic painkillers at the previous correctional institution. The expert testimony that he would need would be, I take it, that given this man's condition as reflected in the records and the degree of pain which was well confirmed by the records from the previous institutions, given his non-responsiveness to some of the medications that had been tried in the past, and there's some of that in the record as well, that he had tried various non-narcotic medications and he was not getting any relief, given the prescription of narcotic medications in the past, that it was cool. Did he get some Darvocet while he was at FCI Cole? He did, didn't he? I believe he did get some Darvocet. Ultimately, they did put him on some narcotic medicine, right? After trying non-narcotic medicines, right? They ultimately did. I don't think the record is clear. It's not clear in my own mind how long he was on the Darvocet and how much he got. But he did not get the treatment that he sought. And the previous institution, he was put in the infirmary a number of times. This institution, they refused to put him in the infirmary. If you combine all that with a personal animus that he alleges these defendants had against him because of his having testified against other personnel from the Cole prison in a previous federal court case, which he alleged, if you combine all that, that could make out a case of deliberate indifference. But the animus doesn't reveal itself in conduct. I mean, they could have had a mindset of one thing, but if they are nonetheless treating him 15 times, responding to what he needs, and it seems like they are attentive to his needs in terms of seeing him and prescribing medication, even though he says it is sadistic and malicious on their part, if this doesn't come out from their actions, there's not a lot we can do. I would disagree with that, if I may, Judge Rendell. You are assuming that their treatment was appropriate treatment. If their treatment was inappropriate under the circumstances, then you would say that conduct and that treatment did manifest their personal animus. As we sit here today, I would submit, the record doesn't show whether the treatment was appropriate or not. The only thing we have about the treatment being appropriate was the self-serving declarations that the two defendants submitted in support of their motion for summary judgment. I'm not criticizing their declarations for being self-serving. That's what people do when they're responding to summary judgment. I think he did, and at 385, I think your colleague has the appendix there, 385, he said he would use Stanley as an expert at trials. It seems to me he had a contemplation that he was going to need something and could have produced it earlier to help us with this concept, was it appropriate or not. This Court has recognized in several of its opinions, and starting with Tavron, of course, that the need for an expert is one of the factors that should be weighed in favor of appointment of counsel. The need to take depositions is another of the factors that should be weighed in favor of appointment of counsel. Once you get past the gatekeeping function of arguable merit, I think you have a great Tavron case if we get there. Well, thank you, Your Honor. And we know what this all wasn't of your doing. To my mind, there is nothing particularly implausible about this claim. Here is a man who is apparently not well liked by prison authorities. He shows up in this new prison. He has a serious medical condition. It's required a lot of heavy-duty treatment. In the past, he asked for treatment. This time of day, refrain from giving him the treatment that they know he needs because of their personal animosity. There's nothing implausible against it. The district court says, and what there is in the record seems to support, that from the first day he arrives at FCI Cole, Mr. Spruill, who is nothing if not insistent upon what he wants, insists on treatment, and over the course of, I think it's more than a dozen times, through the month of May and once into June, before he's transferred. He's only there, what, five, six weeks? About six weeks. Yeah. Not a long stay. Hardly enough time to be deliberately indifferent if you were trying, it seems. But in that short space of time, he's seen, is it a dozen times? Something like that. Something like that. More than a dozen times, I think, and is medicated throughout with different medication regimens to try to meet his insistence that he's facing pain, including ultimately being on narcotics, and this despite contemporaneous records that he's seen running in the yard, he's seen moving without pain within his cell, he's seen doing this, that, and the other thing. So, I mean, these are all things that are in the record and that the district court took into account. Was it wrong for the district court to be considering those things and thinking about whether there's arguable merit here and, as the district court noted, the precious resource of private volunteer counsel should be pulled into the case? Of course it was not wrong. It was entirely appropriate for the district court to take those into account. What was inappropriate was for the district court not to give Mr. Strule the opportunity to refute that evidence, and he can't refute it without taking depositions. If this case were outside the prison context, if this were a medical malpractice case, it would look very, very different. I assure you the plaintiff's counsel would depose the doctors, depose a physician's assistant, question the entries in the medical record, and try to develop a case that, wait a minute, here's a man who desperately needed a certain kind of medication and you deliberately failed to give him that medication. That assumes you could find counsel to take this case, which kind of goes to the question of arguable merit, I guess. It does assume that you could find counsel, but I believe that you could find counsel even to take this case if the district court had but looked for counsel. I don't think that the court should decide this case on the basis of making the assumption the appellees asked you to make, which is that maybe there were no counsel available in northeastern Pennsylvania or even in Philadelphia who traveled to northeastern Pennsylvania who would have represented Mr. Strule. There's no evidence in the record of that. And no evidence that the district court asked the clerk of the court to try to find counsel. If counsel had been found on this case and had already gone up to this court and come back once depositions had been taken, summary judgment motion had been filed, you'd have a different record. Thank you. We'll hear from you on rebuttal. Thank you very much. Mr. Gollum. Good morning, Your Honors. May it please the Court, my name is Alan Gollum. I represent Brian Brown and Dr. McLaughlin, the appellees in this case. He saw Mr. Sproul was seen 14 times during a six-week period. Is Dr. Osgood's report in the record? Yes, it is. Dr. Osgood's report is attached to Mr. Sproul's response to the motion for summary judgment. And Dr. Osgood's report indicates that he found no herniated disc, he had a CT malleogram done. This was sometime in February 2001. He's transferred to SCI Cole Township May 2, 2001. Osgood says that he appears to have no pain. He's complained about pain in the past. If you go back in his records prior to 2001, and this is in the records, it's attached to the motion for summary judgment. Well, no, I think it's attached to Sproul's response. He says that those records show that in 2000 he complained about severe pain, but in 2001 he did not. Well, people's medical condition can change over time, right, Mr. Gollum? Absolutely, Your Honor. Okay, so let's focus on when he's in SCI Cole and your opposing counsel points out that in a case where the court says you've got to have medical testimony, you don't, you're out, it's pretty tough to put a plaintiff in a box where they're incarcerated and say to them, now get a medical expert. But that's not what Judge Doneski did. In the opinion, he only says that's one factor. There's no indication that he wouldn't have granted summary judgment anyway. He didn't consider the expert to be totally outcome determinative, and it wouldn't have been. Well, but he makes a point of pointing it out, and I think even in your briefing you acknowledged that was error, right? That was error. Well, not necessarily. I don't think we need it. I think that ultimately it's your decision, obviously, but based on the case law and the analysis given by Judge Doneski here, it seems that there's enough even with that statement because there's no indication that that expert, this is not the current case where they reversed this court, reversed the summary judgment and appointed counsel. What did you mean when you said this, Mr. Gold? Because it is not admissible, and here you're referring to the expert, lack of expert testimony on the issue of deliberate indifference, the district court erred in relying upon it. Well, what I meant was that it shouldn't even have been considered either way in any way because if he had produced the expert report, it shouldn't have been considered unless it related to causation because if the expert report simply said he didn't meet the standard of care, we have a negligence case. If the expert report says he was deliberately, that Dr. McLaughlin was deliberately indifferent, we have the expert making the legal conclusion. What does the expert think deliberate indifference is? That's for the court to make. That's for the court, and it's a concept that only means something to attorneys and to judges. It's not something that a physician. You're not suggesting, are you, that the lack of an expert or having an expert is something that's irrelevant? I mean, to make a deliberate indifference case. I don't think it's relevant, Your Honor, except to show causation, and this case didn't come off on causation. But wouldn't it be necessary to show exactly what his condition required? In other words, to have him in a wheelchair in the prison population, given his partial paralysis, et cetera, et cetera, his condition would deteriorate, and having him in the infirmary was absolutely necessary to have the care that he needed to monitor his pain and his physical situation. Except, Your Honor, that that's predicated on facts that, according to the record, didn't happen. His partial paralysis didn't begin, according to him, at the 3-2-6 of the record, his deposition, until after the operation in 2003 and 2004. Okay, so you're saying his condition then, well, but then again, okay. And he was long gone from S-I-I. I'm sorry, I didn't mean to say that. I apologize. But, you know, regardless, it could be that an expert might say even his condition before that required certain care. I mean, we just don't know. That's right, but that comes down to a difference of opinion that's negligence. As long as Dr. McLaughlin believed that he was acting on his medical judgment, that's enough. And certainly there's no evidence in this case against Mr. Brown. Well, deliberate indifference in this context would be negligence plus, right? I mean, a necessary sort of prelude to saying that doctor was deliberately indifferent to my medical need is that he was at least negligent. I mean, you'd have to have something like that, right? That's right, but he would have to show sufficient to support a jury verdict that Dr. McLaughlin and Mr. Brown knew that their conduct presented substantial risk of harm to him. So it's negligence plus, right? It may even be gross negligence plus. Let me ask you something else about your answering brief. You said on page 39, no indication exists that Spruill lost his summary judgment motion because of his inability to engage in investigation or to obtain a necessary document. Can that statement withstand the fact that he couldn't get his own medical records? I mean, he wanted his own medical records. You were even, I think, helpful in trying to suggest maybe a way he could get his medical records. The judge is trying to think how he could. He couldn't get his own medical records. Except, Your Honor, it depends how you define medical records. I don't mean to get into what does this mean, but he had everything we had at the summary judgment stage because I attached all the medical records we had. Now, we don't get everything when we subpoena them from the Commonwealth. We only take the years that are in question because the Commonwealth, even though we have to pay them per page, we're totally independent of the Commonwealth. I have as much ability to get documents from them in these kinds of cases as the inmate does. But there's no dispute, is there, that he wanted his full medical file. He wanted his full medical file. And he had no way to get it because... If he could pay for it, he could get it, and he was allowed to review his full medical file as often as he wanted. That was the prison. And then taken at the next step, there's no contesting that because he was incarcerated, he was unable to take the deposition of your clients, right? I would contest that, Your Honor, because courts in the Middle District have permitted depositions of inmates. As a matter of fact, Your Honor, I can show you right now an order in the Stewart case from the Middle District, the same district we're in. Are we talking about depositions of inmates or depositions by inmates? Deposition by inmate, Your Honor, of my client, the doctor in the case. Can I hand that up? I don't think it's necessary. If you represent that that's happening, then was this not something that was sought? Excuse me, Your Honor, I don't want to misrepresent. He has to pay for the deposition. That's the court report. That's the condition that the judge put on it, but my people have to come to the prison. And this is somebody who has been found to be indigent already, right? Yes. So that seems a little hollow to say you can do that if you can pay for it. That is a catch-22, isn't it? Except, Your Honor, he's in no position substantially different than any other indigent. Yeah, we've heard that. But the point is, isn't that really a catch-22? It may be. He's entitled to do a deposition, but he can't pay for it, so therefore he can't have a deposition. But it's a catch-22 that any poor person has, whether they're in prison or not. A poor person who's able to get a lawyer will frequently, as I think you know, have somebody who will manage those costs for them until such time, if any, as there is a recovery. They may manage the deposition costs, but they may not be willing to put up $5,000 or $6,000 for an expert. I've been in a lot of these cases with people where the court has appointed, well, appointment's the wrong word, requested counsel. And I can tell you that only in one out of ten do I ever see the plaintiff's firm come up with an expert. They don't do it for whatever reason. Why don't we run through the tab-mark factors? Because if we get to them, it would seem that we have the Mr. Magaziner's, has a pretty good argument here, the ability to present his or her own case. What about that one? He can do that. He showed repeatedly. He's probably as good a pro se litigant as you're going to find. He filed motion after motion in this case. None of them were dismissed for procedural irregularities. In all the prior cases in which this court has upheld or reversed seeking counsel, there's been something unusual about the case. It hasn't just been that a pro se litigant has difficulty because he's a pro se litigant. If you look at Montgomery, the prison file was gone. The entire medical record had been destroyed, and he constantly got dismissed every time he tried to file a motion to compel. In Montgomery, this court warned the district courts not to take the decision in Montgomery as an indication that every time there's a medical mal case for deliberate indifference and it's meritorious and some investigation is required, counsel should be appointed. There's a policy issue here, and the policy issue is that if you appoint counsel in this case, it's virtually impossible to distinguish it from a thousand other cases, and there's no indication. Right now, the district courts are sometimes waiting a year after they appoint counsel. But that's why you have cases like Tavron. I mean, you can argue, okay, that's a policy argument made to someone, but at this point the question is does he have the ability to present his own case? You say he does. The difficulty of the issues? They're not difficult. How about the degree to which factual investigation may be necessary and the ability to pursue it? We've talked about that, and it looks like that clearly is in his favor. Not necessarily because he had access to the relevant medical records. I gave it to him. But how about the ability to do a deposition? How about the ability to get an expert? But that's not because he didn't have counsel. That's because he didn't have the money to pay for it. And that's one of the factors. It also goes to the capacity to really, it dovetails into the next one, the capacity to retain counsel on his or her own behalf. That would seem to obviously be. This court has said that the inability to retain counsel is not entitled to much weight because it applies to all informed law first prisoners. It said that in a case in which you're deploying counsel, right, but the last one is the same thing with credibility. By the way, this court credibility probably cuts against him. But whether you require testimony from an expert, the court had said he needed an expert in order to try to show his case. That's not what that's not what Judge Vinesky said. How's he going to do it? He noted that he found it significant that he didn't have an expert. This is not like the current case. Wait a minute. Are you saying anything different? To what I just asked? Yes, because it was not a threshold that had to be met. It was simply one factor, and it wasn't determinative because he goes out and analyzes other factors which support his decision independently of the expert. This is a garden variety disagreement with care case. It's a negligence case. It's not deliberate indifference. And even if the court finds that he made the meritorious threshold, there is no reason to distinguish this from thousands of others. Now, Congress has put this court and the district courts in a very difficult position. This is an unfunded mandate in terms of giving you the discretion to ask for counsel. In this case, it wouldn't be the first, and those are the rules of the game we have. Well, I understand. But in order to make sure that the system doesn't collapse, Tebron has to be applied in a narrow fashion, understanding the policies that it sought to promote. Six circuits have a much harder task. What would be an example of a case where somebody who does deserve to be represented by counsel under Tebron? Where there had been a complete denial of medical care deliberately, and where some of the meritorious claims met, where there's not a disagreement in medical care but a denial, or somebody has cancer and they give him an aspirin when they know he has it and they know that he's going to die if he doesn't get the proper treatment, and then the factors are he's illiterate, he has no understanding of the legal tests, and he has no ability to access his medical records because they've been destroyed, or the powers that be won't even give him the relevant medical records. I just want to add, this court in Gordon, an unreported decision, indicated that, and to say it in our brief, indicated that an additional cavern factor was the availability of counsel, that that should be an independent factor. Thank you, Mr. Goldman. Thank you very much, Your Honors. Very quickly, Your Honors. First, Your Honor, Judge Rendell referred me to page 384 of the volume 3 of the appendix, and I'm reading it a little differently than Your Honor is reading it. Page 385. Oh, sorry, 385, you're correct. He's asked, are you going to have a medical expert testify? He said, I'm attempting to obtain a medical expert. A couple, number one will be Dr. Stanley. I don't know exactly what he meant. My guess is he was saying, yeah, he would like to get Dr. Stanley to be an expert, because the judge had suggested that he go to Dr. Stanley. It's highly implausible, because Dr. Stanley was someone who was retained by the prison medical authorities to perform surgery, and the chance of Dr. Stanley agreeing to become an expert in a case against two other fellow doctors is so implausible that it's impossible, I would say. You asked about whether Dr. Osgood's report is in the record. One of Your Honors said that it's on page 461 of the record and at volume 3 of the appendix, and it does say that he appears to be comfortable and pain-free at present. Should his symptoms flare up in the future, you can refer him back and we'll do a laminectomy on him. So contemplates a possibility that the pain will increase in the future. And there are, just preceding that in the appendix, other records from 2000 and 1998 in which the doctors found pronounced spinal degenerative changes, and I don't remember the technical terms for them. Spondylosis, you mean? No, I don't remember. Yes, I don't remember what they said was a particular change that they characterized at that time. Counsel has said that there was no indication that Judge Van Aske would not have granted summary judgment. Anyhow, that cannot be the test. The test is what did he say were the reasons for granting summary judgment? Well, he did list that as a factor, but I take your – He listed two important factors. Yes, I take what Mr. Gold is saying to be that if you drop that out, there's still articulated reasons by Judge Van Aske for coming out the way he came out. He says that the evidence is indisputable that medical care was rendered. And, of course, that is indisputable. The question is, was that medical care appropriate or was it deliberately inappropriate? And the only evidence we have on that is the self-serving declarations of the two defendants. Is that true? Is it just the declarations of the defendants, or are there rational inferences to be drawn from the number of times he was attended to by medical personnel at FCI Cole over the course of six weeks, 14 times in six weeks, and increasing regimen of medication? You can argue for all sorts of inferences. I don't think you can grant summary judgment based on inferences drawn from a medical record where there's been no opportunity. But can you deny counsel based on it? That's the point. It's not at the decision point we've been talking. We've spent virtually no time, maybe zero time, talking about the summary judgment decision itself. We've been talking about was it an abuse of discretion for Judge Van Aske to look at this case and say, I am not, to use his words, and he was quoting Montgomery, going to use the precious resource of volunteer attorney time for this case. He doesn't use the words, but I think implicit in what he was saying is what Mr. Gold said. This is sort of a garden variety, I didn't like the care I got case, and this is not the kind of case where I'm going to tap those scarce resources and pull that in. At that decision point, not summary judgment, but abuse of discretion in appointing counsel, was it wrong for Judge Van Aske, assuming he did, and I think the record could fairly be read to indicate he did, to infer things from that course of treatment that Mr. Spruill did receive? I would answer that question by saying yes. It's not up to a court to infer the propriety or impropriety of medical treatment by looking at medical records without being informed about how to interpret them, what their significance is in the context of the patient's medical condition. Then I have to ask you this with my colleague's indulgence because your time is up, and I ask it. Then I go back to my first question to you. If a court cannot do that when it's deciding to appoint counsel or not, then what are the limits on the rule you ask us to establish? How is this case different from thousands of other cases where there are inmates who don't like the care they get and want to have doctors look at them, want to have medical experts, want to depose the people in the hospital? How is it different? First of all, it has to be a serious medical need. Most of the cases, at least back when I was a law clerk and staff law clerks talked with them, a few came up to us, most of the cases were not serious medical needs. This is a serious medical need if you've been judged a nasty testament. Secondly, there is evidence in the record that this medical need was treated differently in other institutions than it was treated at Culp. He was in the infirmary at the previous Congressional Institute and not the previous prison, not at Culp. He did receive different drugs at the previous prison, not at Culp. There is enough in the record to say maybe there is something here. Could he get summary judgment in his favor? Of course not. But was there enough in this record, given the serious medical need that Judge Gnatsky found, given the way it had been treated by other prisons differently than it was treated here, there was enough in the record for Judge Gnatsky to say, yes, this is a case in which I'm now going to get past the threshold question and go to the Tavron factors. And Judge Gnatsky, I'm sure he's more than a little annoyed with this case. That's understandable. He's gone a little far, though. He creates two catch-22s when he says it's significant you don't have an expert, it's significant you don't have any evidence of motives, when there were no depositions taken. Mr. Magaziner, doesn't he kind of bend over backwards for your client? I mean, he tells your client at different places, look, if you want to go back to your deposition and file an errata sheet so you can give what you think are the correct answers, quote, unquote, I'll let you do that. He upholds motions to compel that are brought by your client pro se. He seemed to be, as I was reading it, trying to make sure that Mr. Spruill got a fair shot. I'm not sure where he got the judge-seemed-to-be-annoyed part. The judge said in his April 21, 2005 decision, refusing to appoint counsel, he cited two things as evidence of Mr. Spruill's ability to litigate on his own. One, he said Mr. Spruill had succeeded in his appeal to this circuit. Well, that's not evidence because Mr. Spruill was represented by a lawyer from Covington and Bruin in his appeal to this circuit. So Judge Gnatsky cites that as evidence of his ability. Next, he cites a motion to compel that Mr. Spruill had just won. The motion to compel and the response is just before the April 21, 2005 order. If you look at that, you'll see that Judge Gnatsky said, Mr. Spruill filed a motion. The defendants did not bother to respond, to oppose, or to object in any form whatsoever. And he granted that motion. So that doesn't show a whole lot about the ability to litigate when you have won an uncontested motion that the other side doesn't even bother to respond to. I've seen lawyers lose those, so. And he did grant motions to compel, but the motions to compel, that's pretty simple litigation. You file an obituary, the other side doesn't respond at all. You file a motion, they don't oppose the motion. The court grants it. But in terms of proving the state of mind, which is what the challenge that this court gave Mr. Spruill in remand Judge Becker's opinion says, he has to go out and prove the state of mind of these defendants. No depositions, no ability to prove the state of mind. How is he supposed to gather evidence on the state of mind as an incarcerated person? Thank you very much. Thank you, Mr. Magsiner, Ms. Kimmelman. Thank you, and thank Deckard for agreeing to take on this appeal. While he didn't have counsel below, he was well served before us. Thank you. It's my pleasure. Mr. Gold, thank you very much. Thank you, Your Honor. We'll ask the court to recess the court.